

FILED

Apr 02 2019, 9:57 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Joel M. Schumm
Appellate Clinic
Indiana University
Robert H. McKinney School of
Law
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

State of Indiana,

*Appellant-Petitioner,*

v.

J.T.,

*Appellee-Respondent.*

April 2, 2019

Court of Appeals Case No.
18A-JV-1491

Appeal from the Elkhart Circuit
Court

The Honorable Michael A.
Christofeno, Judge

The Honorable Deborah Domine,
Magistrate

Trial Court Cause No.
20C01-1508-JD-290

**Sharpnack, Senior Judge.**

# Statement of the Case

The State filed a petition alleging that twelve-year-old J.T. was a juvenile delinquent for committing an act that would have been murder, a felony, if committed by an adult. The State later moved the juvenile court to waive jurisdiction over J.T. and transfer the case to criminal court. The court denied the State's motion after an evidentiary hearing.

In this discretionary interlocutory appeal, the State asks the Court to reverse the juvenile court's judgment. By contrast, J.T. requests dismissal of the State's appeal. We deny J.T.'s request to dismiss this appeal and affirm the judgment of the juvenile court.

# Issues

The State raises one issue, which we restate as: whether the juvenile court abused its discretion in denying the State's request to waive jurisdiction over J.T. On cross-appeal, J.T. argues that the State has no authority to seek discretionary interlocutory review of a juvenile court's refusal to waive jurisdiction over a juvenile.

# Facts and Procedural History

As we describe the facts of this case, we keep in mind that the juvenile court has not yet issued a final decision on the merits. In July 2015, twelve-year-old J.T.

lived with her father, Edwin Torres; her stepmother, Maria Torres;[1] her half-sister; and her half-brother in an apartment in Elkhart, Indiana. J.T. had displayed symptoms of severe mental illness, and the symptoms intensified in early 2015. She had poor grades at school, and she and Edwin both later stated that she had suffered from headaches, had difficulty sleeping, talked about hearing voices, and had blackouts. J.T. talked less and spent increasing amounts of time alone in her room. Several persons noted that J.T. discussed hearing the voices of people named Star and Anna. Star reportedly told J.T. to hurt people, while Anna told J.T. to ignore Star. J.T. also sometimes told people her name was Anna or Star. J.T. also displayed an obsession with a cartoonish character named Laughing Jack, who was featured in stories on websites. Laughing Jack, who dressed in black and white and whose face was painted like a clown, was frequently depicted using knives to commit murder.

[5]     J.T. repeatedly asked her mother, Dishay Hydorn-Patrick, Edwin, and other relatives for help with her symptoms. She also spoke with a school counselor, who urged Edwin to take J.T. to a mental health professional. He instead took J.T. to their family doctor. Later, several appointments were scheduled with a counselor, but J.T. missed the appointments because of insurance issues and because Edwin had undergone back surgery and could not drive her to the counselor's office.

---

[1] We will refer to J.T.'s father, stepmother, and mother by their first names to minimize confusion.

[6] On the night of July 23, 2015, J.T. texted her friend J.P. to arrange to meet at a nearby park at 10:00 p.m. that night. J.T. texted in capital letters that she wanted to leave tonight because she could not "take it anymore." Tr. Vol. II, p. 141. She also said she was "about to snap." *Id.* at 144. They discussed bringing food, water and clothing. J.P. was aware of J.T.'s alternate personas, and she later concluded she had been texting with Star that night.

[7] After communicating with J.P., J.T. interacted with Edwin and Maria as they ate dinner and watched television. J.T.'s half-sister had gone to bed, and J.T.'s half-brother was not at home that night. Edwin was disturbed because J.T. kept displaying a "big grin" "showing all her teeth." *Id.* at 74. She also stood in a strange posture, but she repeatedly insisted she was fine.

[8] Later that night, Edwin and Maria heard a loud noise and smelled smoke. Maria opened the door to J.T.'s bedroom, and smoke poured out of the room into the hallway. J.T. was standing in the middle of her room and did not respond to Maria. Edwin entered the bedroom and saw a fire on the floor and a bigger fire in the closet.

[9] Meanwhile, Maria took J.T. out into the hallway. As Edwin tried to put out the fires, he heard his wife scream that J.T. had a knife. He entered the hallway and saw Maria knocking on the door of J.T.'s half-sister's bedroom. When she awoke and opened the door, she saw her mother, Maria, standing there with blood on her clothes. Maria told J.T.'s half-sister, "I'm dying call the police." *Id.* at 57. She called 911.

[10] Edwin found J.T. near the apartment's front door. She was holding a knife and was standing in an unusual posture. He looked into her eyes and "just didn't recognize her." *Id.* at 76. Edwin told J.T. they needed to leave, or they would all die in the fire. She told him to stay back and not come closer, speaking in a "clownish" tone of voice. *Id.* Edwin approached J.T., and she started to swing at him with the knife. He opened the door and struggled with her as they moved into the hallway. Edwin disarmed J.T. and threw the knife away, but J.T. escaped from him and ran out of the apartment building. At that point, he realized he was bleeding heavily from one arm.

[11] Edwin reentered the smoke-filled apartment and found his other daughter. She told him that she thought Maria was dead, and they went outside.

[12] Officer Daniel Mayer of the Elkhart Police Department was dispatched to the apartment building to investigate the 911 call. Upon arriving at the scene, Officer Mayer and another officer entered the building and noticed a large amount of blood in the hallway. They followed a blood trail up a staircase to the third floor. The officers found a knife in the hallway near the door to J.T.'s apartment, from which smoke was emanating. The smoke was so thick that Officer Mayer retrieved a gas mask from his car to enter the apartment. Other officers arrived and interviewed Edwin and J.T.'s half-sister.

[13] Firefighters arrived and searched the apartment. They found Maria lying on the floor in one of the bedrooms and removed her from the apartment. She was taken to a hospital, where she was pronounced dead. The cause of Maria's

death was multiple stab wounds to her face and torso, including a three-and three-quarter-inch deep stab wound to her chest.

[14] Meanwhile, J.P. slipped out of her home and met J.T., as previously arranged. J.T. had blood on her hands and clothes. J.T. washed the blood off of her hands in a nearby waterway and told J.P. she had started a fire and stabbed Maria and Edwin. The two girls then walked along a railroad track and left Elkhart. At some point, J.T. changed into clean clothes.

[15] In the early morning hours of July 24, 2015, Zachary Sleeper was awakened by a knock on his door. He encountered two girls, later identified as J.T. and J.P. They asked for something to eat, claiming they had been hiking with their families and got lost. One of the girls was barefoot. Sleeper was suspicious because there were no hiking trails in his area. He offered to call their families, but the girls avoided providing any information. Next, Sleeper asked them to stay on the porch while he cooked something for them. He called the police as he cooked, assuming the girls were runaways. The police arrived and took them into custody.

[16] The girls were carrying backpacks. The police looked in one of the bags and found bloodstained pants. Several officers questioned J.P., who told the police the pants belonged to J.T. J.P. also told the officers that J.T. had exhibited different personalities. J.T. was placed in the Elkhart County Juvenile Detention Center (JDC).

[17]     On August 3, 2015, the State filed a Petition for Authority to File Juvenile Delinquency Action and tendered a Delinquency Petition.[2] The Delinquency Petition alleged J.T. had committed an act that would constitute murder, a felony, if committed by an adult. On that same day, the juvenile court authorized the State to file the Delinquency Petition. A guardian ad litem (GAL), Elizabeth Bellin, was assigned to J.T.'s case shortly after she was detained. GAL Bellin filed an initial report with the juvenile court, detailing J.T.'s symptoms of severe mental illness. On August 4, 2015, after reviewing the report, the court ordered the Elkhart County Probation Department to investigate alternative placements for J.T. The court further ordered that J.T. be evaluated for mental illness.

[18]     Next, the court scheduled an initial hearing for August 7, 2015. During the initial hearing, the State informed the juvenile court that the State "does not intend to seek a waiver of juvenile jurisdiction" "at this time." Appellant's App. Vol. II, p. 81.

[19]     On August 13, J.T. filed a motion to determine her competency to participate in the proceedings. The juvenile court granted the motion and appointed mental health professionals to investigate J.T.'s mental state. Meanwhile, juvenile probation employees researched secure residential locations, other than the JDC, where J.T. could obtain more thorough mental health treatment. The

---

[2] DCS also began a CHINS case for J.T. involving Edwin and Dishay.

employees investigated several private treatment centers and the state-run facilities owned by the Indiana Family and Social Services Administration's Division of Mental Health and Addiction (DMHA), but they were unsuccessful in finding a placement for J.T.

[20] On November 12, the juvenile court held an evidentiary hearing as to J.T.'s competence. Two psychiatrists and one psychologist opined that J.T. displayed symptoms consistent with Dissociative Identity Disorder (DID).[3] All three further expressed opinions that J.T. was not competent to participate in her defense. The juvenile court concluded J.T. was "not competent to stand trial and that she should be placed through [DMHA]." *Id.* at 109. The court directed DMHA to confine J.T. in "an appropriate psychiatric institution until her competency is restored." *Id.* at 112.

[21] The prosecutor did not object to the juvenile court's determination, but on November 19, a deputy attorney general sought to intervene in the case on behalf of the DMHA. DMHA disputed the juvenile court's authority to order

---

[3] "Dissociative identity disorder (DID) was formerly called multiple personality disorder. People with DID develop one or more alternate personalities that function with or without the awareness of the person's usual personality." Cleveland Clinic, Dissociative Identity Disorder, https://my.clevelandclinic.org/health/diseases/9792-dissociative-identity-disorder-multiple-personality-disorder (last visited March 26, 2019). DID, which occurs in children and adults, is associated with "[t]rauma experienced at an early age" and also with self-injury, suicide, and hospitalizations. Tr. Ex. Vol. I, State's Ex. 32. It may also be linked with posttraumatic stress disorder (PTSD). *Id.*

that J.T. be placed in a state hospital. After an evidentiary hearing, the juvenile court reaffirmed its order that J.T. be placed in a DMHA facility.[4]

[22] On December 1, 2015, Elkhart County probation officers transported J.T. to LaRue Carter Hospital (the Hospital), a DMHA facility, for treatment. A substantial delay occurred because the Hospital's staff indicated they had no experience with returning juveniles to mental competence and stated they were unsure it could be done. In the meantime, the juvenile court held periodic review hearings on March 2, 2016, December 15, 2016, February 2, 2017, May 18, 2017, May 30, 2017, and June 27, 2017. As we discuss in more detail below, J.T. showed some signs of improvement while she was at the Hospital but still displayed symptoms associated with DID and PTSD.

[23] On March 23, 2017, the juvenile court appointed two mental health professionals to reassess J.T.'s competency to participate in her own defense. The competency assessments were delayed due to scheduling issues, but an assessment was filed on September 6, 2017, stating that J.T. was competent to stand trial. The court scheduled an evidentiary hearing to determine J.T.'s competency on October 4, 2017.

---

[4] DMHA filed a motion asking the juvenile court to reconsider its order placing J.T. in the DMHA's custody. The court denied the motion, and DMHA appealed. A panel of this Court dismissed DMHA's appeal in an unpublished memorandum decision, concluding that the agency was required to follow the procedures for a discretionary interlocutory appeal and had failed. *In re J.T.*, Case No. 20A05-1602-JV-373 (Ind. Ct. App. Oct. 26, 2016).

[24] On September 13, 2017, the State filed a motion for waiver of juvenile court jurisdiction. After the October 4 hearing, the court ordered an additional competency evaluation. On January 19, 2018, after receipt of the final competency evaluation, the court determined J.T. was competent to participate in her own defense and scheduled a hearing on the State's motion to waive jurisdiction.

[25] The juvenile court held an evidentiary hearing on the State's waiver motion on April 23, 2018, May 31, 2018, and June 1, 2018. On June 4, 2018, the court issued an order denying the State's motion for waiver of jurisdiction. The court determined the State had provided sufficient evidence to meet the statutory elements of waiver by a preponderance of the evidence, but that J.T. "has demonstrated that it would be in the best interest of the child and the safety and welfare of the community for [her] to remain within the juvenile justice system. The child has met her assigned burden of proof." Appellant's App. Vol. III, p. 191.

[26] The State moved the juvenile court to certify its June 4, 2018 order for discretionary interlocutory appeal. The court granted the motion and stayed further proceedings in the case, with the exception of determining placement of J.T. pending resolution of her case. Next, the State petitioned this Court to accept the interlocutory appeal. This Court's motions panel granted the State's

petition, and this appeal followed.[5]  In the meantime, J.T. has been placed at a secure residential facility in Ohio.  The facility has a therapist that specializes in treating DID.  J.T.'s case is subject to periodic review by the juvenile court.

# Discussion and Decision

## I. Cross-Appeal – Interlocutory Appellate Jurisdiction

[27]  We first address J.T.'s cross-appeal claim.  J.T. argues that the State lacks the authority to seek interlocutory review of the juvenile court's denial of the State's motion to waive jurisdiction and asks this Court to dismiss the State's appeal. Whether the State may appeal the court's order is a question of law, which we review de novo.  *State v. I.T.*, 4 N.E.3d 1139, 1142 (Ind. 2014).

[28]  It is well established that the State may appeal only when authorized by statute. *Id.*  Further, the State's statutory right of appeal contravenes common law principles and must be strictly construed.  *State v. Holland*, 273 Ind. 284, 286, 403 N.E.2d 832, 833 (1980).

[29]  The General Assembly has determined, "the right of the state to appeal in a juvenile delinquency case is governed by IC 35-38-4-2."  Ind. Code § 31-37-13-6 (2015).  In turn, Indiana Code section 35-38-4-2 (2015) provides:

---

[5] The motions panel later directed that this case and *State v. D.R.*, ___ N.E.3d ___, Case No. 18A-JV-1608, 2019 WL 577108 (Ind. Ct. App. 2019), would be assigned to the same writing panel.

Appeals to the supreme court or to the court of appeals, if the court rules so provide, may be taken by the state in the following cases:

(1) From an order granting a motion to dismiss one (1) or more counts of an indictment or information.

(2) From an order or judgment for the defendant, upon the defendant's motion for discharge because of delay of the defendant's trial not caused by the defendant's act, or upon the defendant's plea of former jeopardy, presented and ruled upon prior to trial.

(3) From an order granting a motion to correct errors.

(4) Upon a question reserved by the state, if the defendant is acquitted.

(5) From an order granting a motion to suppress evidence, if the ultimate effect of the order is to preclude further prosecution of one (1) or more counts of an information or indictment.

(6) From any interlocutory order if the trial court certifies and the court on appeal or a judge thereof finds on petition that:

(A) the appellant will suffer substantial expense, damage, or injury if the order is erroneous and the determination thereof is withheld until after judgment;

(B) the order involves a substantial question of law, the early determination of which will promote a more orderly disposition of the case; or

(C) the remedy by appeal after judgment is otherwise inadequate.[6]

Indiana Code section 35-38-4-2(6) does not place any explicit limits on the types of juvenile court orders that may be appealed on an interlocutory basis.

[30] In *State v. D.R.*, 2019 WL 577108, we considered whether the State may seek discretionary interlocutory appeal of a juvenile court's denial of a petition to waive jurisdiction. We noted that if the State may not seek interlocutory review of a juvenile court's decision to deny waiver of jurisdiction, then such a denial is foreclosed from meaningful appellate review. *Id.* at *3. That result is not mandated by the plain language of Indiana Code sections 31-37-13-6 or 35-38-4-2(6).

[31] J.T. argues the State cannot appeal a juvenile court's denial of waiver because Indiana Code section 31-37-11-3 (1997) provides: "If waiver is denied, the factfinding hearing must be commenced not later than ten (10) days, excluding Saturdays, Sundays, and legal holidays, after the denial." J.T. concludes that an interlocutory appeal by the State would conflict with the ten-day statutory deadline.

---

[6] The legislature added subsection (6) in 1983. Prior to that, the State could not take interlocutory appeals pursuant to the Indiana Rules of Appellate Procedure and had no statutory authority to take an interlocutory appeal. *State v. Peters*, 637 N.E.2d 145, 147 (Ind. Ct. App. 1994).

[32]     In *State v. D.R.*, we determined that the deadline set forth in Indiana Code section 31-37-11-3 does not bar an interlocutory appeal by the State.  2019 WL 577108, at *3.  When the State or a juvenile court fails to comply with Section 31-37-11-3's ten-day deadline, the remedy is as follows:  "the child shall be released on the child's own recognizance or to the child's parents, guardian, or custodian."  Ind. Code § 31-37-11-7 (1997).  Section 31-37-11-7 thus does not require dismissal of a juvenile delinquency petition for delay, and as a result, the State may seek an interlocutory appeal if the juvenile is released from detention during the appeal.

[33]     J.T. further argues that even if the State is not barred from seeking an interlocutory appeal in these circumstances, this Court should reconsider the motions panel's decision to accept jurisdiction over this appeal.  Specifically, J.T. argues the State has failed to show that this case meets any of the criteria set forth in Indiana Code section 35-38-4-2(6).  She further claims she has suffered injury from the State's interlocutory appeal because several residential mental health providers declined to accept her for treatment while her case is pending.

[34]     We have "the inherent authority" to reconsider the motions panel's decisions while an appeal remains pending.  *Haggerty v. Anonymous Party 1*, 998 N.E.2d 286, 293 (Ind. Ct. App. 2013).  The party seeking reconsideration must provide "clear authority establishing that our motions panel erred."  *Id.*  Having reviewed the evidence, we conclude there are grounds for an interlocutory

appeal under Indiana Code section 35-38-4-2(6), and we will not reconsider the motions panel's decision.

## II. The Juvenile Court's Waiver Ruling

[35] The State argues the juvenile court should have waived jurisdiction over J.T. and transferred her to criminal court, claiming that the court's decision lacks sufficient evidentiary support. Under the circumstances of this case, waiver of juvenile jurisdiction is governed by Indiana Code section 31-30-3-4 (2015). That statute provides:

> Upon motion of the prosecuting attorney and after full investigation and hearing, the juvenile court shall waive jurisdiction if it finds that:
>
> (1) the child is charged with an act that would be murder if committed by an adult;
>
> (2) there is probable cause to believe that the child has committed the act; and
>
> (3) the child was at least twelve (12) years of age when the act charged was allegedly committed;
>
> unless it would be in the best interests of the child and of the safety and welfare of the community for the child to remain within the juvenile justice system.

*Id.*

[36]    J.T. does not dispute that the State demonstrated she committed an act that, if committed by an adult, would be murder. She further concedes the State demonstrated probable cause to believe she committed the act and that she was above the minimum age at the time of the alleged act. Proof of these elements creates a rebuttable presumption in favor of waiver. *Moore v. State*, 723 N.E.2d 442, 446 (Ind. Ct. App. 2000). The juvenile court determined J.T. had presented evidence that rebutted the presumption.

[37]    The State argues J.T. was required to present "clear and convincing evidence" to rebut the presumption of waiver. Reply Br. p. 8. J.T. responds that her burden of proof was preponderance of the evidence. We need not address the State's argument because the State did not present it to the juvenile court. To the contrary, the State told the juvenile court, "[t]he question here is, have they proven by a preponderance that she is not going to be a danger to society . . . ." Tr. Vol. III, p. 141. The State's argument is procedurally defaulted. *See B.R. v. State*, 823 N.E.2d 301, 306 (Ind. Ct. App. 2005) (jurisdictional claim waived because appellant raised it on appeal for the first time).

[38]    In any event, this Court's standard of review is well established: we examine a juvenile court's decision on waiver of jurisdiction for an abuse of discretion. *Vance v. State*, 640 N.E.2d 51, 57 (Ind. 1994). An abuse of discretion occurs when a decision is "'clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom.'" *K.S. v. State*, 849 N.E.2d 538, 544 (Ind. 2006) (quoting *In re L.J.M.*, 473 N.E.2d 637, 640 (Ind. Ct. App. 1985)). We will

not weigh the evidence nor judge the credibility of witnesses, "considering both the record of the waiver hearing" and the reasons stated by the juvenile court. *Goad v. State*, 516 N.E.2d 26, 27 (Ind. 1987). It is for the juvenile court judge, after weighing the effects of retaining or waiving jurisdiction, to determine which is the more desirable alternative. *Vance*, 640 N.E.2d at 57.

[39] The State, as the proponent of waiver, had the ultimate burden to prove waiver was appropriate. The denial of waiver by the juvenile court is, in effect, a negative judgment. The State must show us that the court's decision was contrary to law, that there was no evidence to support the denial of waiver, and that all evidence and circumstances pointed to a grant of waiver. *State v. D.R.*, 2019 WL 577108, at *4.

[40] J.T. stands accused of an act that would constitute murder, one of the most serious crimes in Indiana. At the age of twelve, she allegedly repeatedly stabbed her stepmother, Maria, in the face and chest with a knife, causing her death. There is evidence that J.T. allegedly committed the brutal act with some degree of premeditation: (1) prior to the attack, she searched on the internet for how to sharpen knives and how to hide from the police; (2) she had texted a friend before Maria's death to arrange a meeting later that night, claiming she wanted to leave home; (3) she hid knives in her room; and (4) she set a fire in her bedroom and disabled a smoke alarm in or near her bedroom before the attack.

[41]     Nevertheless, it is undisputed that J.T. displayed symptoms of severe mental illness, specifically DID, in the months preceding the attack, on the day of the attack, and in the days and months after Maria's death. To begin with, J.T. had a traumatic childhood. She lived with her mother, Dishay, until the age of twelve. Dishay also had a traumatic childhood, reporting that she had been sexually abused by several relatives and grew up around controlled substances. She has abused alcohol and controlled substances for most of her life. In addition, Dishay reported that she had been diagnosed with depression, bipolar disorder, and PTSD.

[42]     Dishay gave birth to a son at the age of fifteen, then a daughter a few years later,[7] and then J.T. a few years after that, all by different fathers. Edwin was already married to Maria, and they had two children together, when Edwin had an affair with Dishay. After J.T.'s birth, Edwin left his wife and other children and lived with J.T. and Dishay for six to seven years. During her early years, J.T. witnessed her mother abusing alcohol and controlled substances. She also saw her parents argue constantly. In addition, J.T. was repeatedly physically and verbally abused by her half-brother, who punched and choked her. J.T. did not tell her parents about her brother's abuse because she was afraid it would spur him to abuse her more severely. J.T. was also bullied at school.

---

[7] J.T.'s half-sister on her mother's side lived with her own father from a young age.

[43] When J.T. was around eight years old, her parents separated, and Edwin moved out. Dishay married a registered sex offender. He was frequently physically abusive to Dishay in J.T.'s presence. At one point, J.T.'s stepfather abused Dishay so severely that she was hospitalized for three to four days. J.T. also witnessed her mother using a knife to cut herself during this time.

[44] Eventually, DCS intervened and removed J.T. and her half-brother from Dishay's home. Dishay divorced her husband, but her substance abuse issues and a pending criminal case prevented her from regaining custody, so DCS placed J.T. with Edwin. It must be noted that a psychologist who assessed J.T. after Maria's death expressed an opinion that "it is almost a certainty" that J.T. had been sexually abused by an unidentified person while living with her mother, although J.T. denied any sexual abuse. Tr. Ex. Vol. I, Defendant's Ex. B, p. 5.

[45] When DCS placed J.T. with Edwin, he was once again living with Maria, whom he had never divorced, and their two children (J.T.'s half-brother and half-sister on her father's side). J.T. got along well with her stepmother, later describing her as "not a replacement but a real mom to me." *Id.* at 18. However, at one point, Maria moved out with her two children, and J.T. and her father lived on their own for one to two years before her father and stepmother reunited.

[46] Living with Edwin was also traumatic. J.T. later reported that her father was verbally abusive to her, Maria, and her half-siblings. In particular, Edwin

would tell J.T. she was a liar and made horrible decisions, "just like [her] mom." *Id.* at 16. At one point, J.T.'s half-sister called the police when Edwin threatened to physically attack J.T.'s half-brother.

[47] J.T. reported that when she lived with her father and stepmother, she continued to be bullied at school and had few friends. She became friends with J.P. when they met in fifth grade. They wrote stories together, mainly horror stories known as "creepypastas."[8] Tr. Vol. II, p. 109. They also read horror stories written by others featuring murderous characters named Laughing Jack and Jeff the Killer, among others. Laughing Jack's stories describe him as dressed in black and white, with a face painted like a clown. In at least one story, he stabbed people to death, removed their organs, and replaced the organs with candy. Tr. Ex. Vol. I, Defendant's Ex. H, p. 7. J.T. wrote her own story about Laughing Jack. The story featured her and Laughing Jack sharing candy. J.T. also drew a picture of her and Laughing Jack and showed it to J.P.

[48] J.P. noticed J.T. had mood swings, to the point that J.T. could become "a little different person." Tr. Vol. II, p. 110. J.T. told J.P. that she had multiple personalities, which were named Star and Anna. On one occasion, they were having lunch at school, and J.T. did not recognize the friends with whom they were sitting. J.P. thought that the Star persona was in control at that time. On

---

[8] "Creepypastas are horror-related legends or images that have been copied and pasted around the Internet. These Internet entries are often brief, user-generated, paranormal stories intended to scare readers. They include gruesome tales of murder, suicide, and otherworldly occurrences." Wikipedia, Creepypasta, https://en.wikipedia.org/wiki/Creepypasta (last visited March 26, 2019) (links omitted).

other occasions, J.T. expressed dislike and fear of Star, claiming Star was "getting stronger" and could take her over. *Id.* at 154.

[49] J.T.'s family had ample notice of her mental illness. When she lived with Dishay, she heard voices, including Star's and Anna's voices, and saw things that were not there. The voices became louder when she lived with Edwin. He told her to "shake it off." Tr. Ex. Vol. I, Defendant's Ex. 2, p. 18.

[50] J.T. later reported that after Maria reunited with Edwin, Star and Anna's personalities became more pronounced. She perceived that Star screamed at her and urged her to start fights. J.T. also thought that someone was constantly watching her, and she dressed in the shower rather than in her own room. There were periods of time when she did not remember what she did or what happened around her. When these blackouts occurred at school, other children would tell her what she said or did, and she would not remember them. In addition, J.T. developed debilitating headaches.

[51] J.T. told Dishay, Edwin, and an aunt about her symptoms in April 2015. Specifically, she told her father about her headaches, her blackouts, and hearing voices in her head. J.T. also told a school counselor that she was hearing voices, and the counselor met with Edwin. The counselor gave him information about two mental health treatment centers, but he stated that he would take J.T. to their family physician instead. J.T.'s family doctor, Dr. Thomas Sutula, noted that J.T. reported hearing voices in her head yelling at her, and the voices were named Star and Anna. Eventually, two appointments

were scheduled with a counselor, but J.T. missed both appointments because Edwin had insurance issues and also had had back surgery rendering him unable to transport her.

[52] In late May or early June 2015, Edwin observed that J.T. had drawn inappropriate pictures involving Laughing Jack. In addition, she had begun dressing in white and black clothing similar to Laughing Jack's clothing and would paint herself white and black, like a clown. J.T. also became "preoccupied with candy," which was Laughing Jack's favorite item. Tr. Ex. Vol. I, Defendant's Ex. B, p. 20.

[53] In the week before July 25, 2015, J.T. used her mobile phone to search for information on how to hide from the police, how to make poison, how to sharpen knives, and how to survive in the woods. She had also searched for a disturbing video featuring persons being stabbed to death, a website that featured violent stories, and for the song "Pop Goes the Weasel." She searched for that song in connection with Laughing Jack.

[54] On July 23, 2015, when J.T. texted J.P. to arrange to meet, J.P. later realized she was interacting with Star's persona. J.T. told J.P. that she would signal her arrival at the meeting place by whistling the song "Pop Goes the Weasel." Tr. Vol. II, p. 54. J.T. later reported on several occasions that she did not remember much of that night. She said she blacked out several times earlier in the evening, and after she went into her bedroom and closed her door, she did not remember anything else until after she met with J.P.

[55]   After the incident, J.T. was initially incarcerated in the JDC.  Upon arriving at the JDC, she told staff she would bite people "for any reason at any time," but carrying candy lessened her urge to bite.  Tr. Ex. Vol. I, Defendant's Ex. E, p. 6.  During a room check on July 26, 2015, JDC staff found only two pieces of paper in her room.  She repeatedly wrote the word "candy" on one paper, and on the other she wrote the lyrics to "Pop Goes the Weasel."  *Id.*

[56]   GAL Bellin later testified that upon meeting J.T. at the JDC, J.T. reported hearing "voices in her head" telling her what do.  Tr. Vol. II, p. 174.  The frequency with which J.T. heard voices and hallucinated increased after she arrived at the JDC.  Tr. Ex. Vol. I, Defendant's Ex. E, p. 6.  J.T. further stated she had blackouts, headaches, and difficulty sleeping.  She also told GAL Bellin that she had asked Edwin, Dishay, Maria, and an aunt to get her help for the voices in her head and other symptoms six months prior to the incident.

[57]   Several mental health professionals examined J.T. in the months after Maria's death, and they concluded that J.T. showed signs of DID and PTSD.  During one evaluation, she talked about her "preoccupation" with the character Laughing Jack, as well as hallucinations and paranoia.  Tr. Ex. Vol. I, Defendant's Ex. B, p. 5.  A third evaluator determined J.T. was immature for her age, and her thought processes and behavior were similar to a child much younger than twelve years of age.

[58]   J.T. arrived at the Hospital in December 2015, per the juvenile court's order.  She was placed on Risperdal, an antipsychotic medicine, upon her arrival and

remained on the medicine through early March 2016. J.T. developed a positive conduct record and was one of the most well-behaved residents of her unit. In addition, she maintained good grades in her schoolwork. Dr. Syed Khan, who treated J.T. for the majority of her stay at the Hospital, did not see any signs of DID but concurred with previous diagnoses of PTSD. In addition, J.T. spoke with a counselor on a weekly basis and eventually began to process her grief about Maria's death.

[59] Despite showing some signs of improvement and lessening of symptoms, J.T.'s mental health conditions were not in complete remission. Dr. Jeffery Vanderwater-Piercy visited J.T. at the Hospital to assess her competency. In a September 4, 2017 report, the doctor stated J.T. continued to experience symptoms of "psychosis, disassociation, posttraumatic stress, and depression." Tr. Ex. Vol. I, Defendant's Ex. B, p. 7. He further stated that she presented a "very severe and complicated clinical picture." Tr. Vol. I, p. 203. Dr. Vanderwater-Piercy explained, "those symptoms were still there to a degree, just not to the degree that they were when she was first admitted to the hospital." *Id.* at 204. In addition, J.T. continued to express "considerable anger" toward her parents, believing that they had let her down by not properly responding to her requests for help. Tr. Ex. Vol. I, Defendant's Ex. H, p. 12.

[60] GAL Bellin visited J.T. at the Hospital on a monthly basis and later stated that she thought that J.T. had minimized her symptoms to the Hospital's staff, perhaps in the belief that doing so would facilitate her release. GAL Bellin's conclusion was based on her meetings with J.T. and the Hospital's staff, which

gave her the impression "there was very conflicting information between what [J.T.] was disclosing to . . . myself about her symptoms, and what she was disclosing to individuals at LaRue Carter." Tr. Vol. II, p, 182. Bellin explained that J.T. continued to tell her about disturbing symptoms:

> She did indicate over the period-of-time that she was at LaRue Carter, which was significant, that she saw shadows, that she saw movements in her room at night. At one point, she had booby-trapped her room to prevent bookshelves from falling forward or doors opening. There was a tree painted on her wall at her room—in her room, or pinned up, I should say, and she had indicated to me that the tree had arms and the arms were moving at one point.
>
> She would hear voices, although, she could not determine what they were saying. It was—she had described to me as whispers. They had—in some instances, they were more significant at certain times and then another instance, less significant.

*Id.* at 178. Further, every visit was "traumatic" for GAL Bellin because J.T. "would cry, she would yell, she would beg, she would be rational, she would be irrational. She would talk in circular forms. She would be coherent. She would, at times, not make sense." *Id.*

[61] GAL Bellin concluded that J.T. was kept safe while at the Hospital, but she was not getting appropriate treatment on a therapeutic level. Toward the end of J.T.'s stay at the Hospital, prior to being returned to the JDC for further proceedings in this case, J.T. had an incident in which she "seemed to disassociate from her body" and had trouble moving. *Id.* at 167. In December

2017, Dr. Parker evaluated J.T. for competency to stand trial while she was still at the Hospital. In his report, he noted J.T. expressed frustration that she was not being treated for DID and that she felt "Anna and Star were still present." Tr. Ex. Vol. I, J.T.'s Ex. B. Dr. Parker diagnosed her with "probable DID." *Id.*

[62] When J.T. returned to the JDC in 2018, it seemed to GAL Bellin that "we reverted back to the beginning of the case." Tr. Vol. II, p. 181. "[T]here's self-harm, [the] voices are back . . . in full force, . . . they're screaming at her. She had indicated to me the headaches are back, she can't sleep." *Id.* at 182.

[63] The JDC's records support GAL Bellin's testimony that J.T. suffered from resurgent symptoms of mental illness. On April 9, 2018, she reported suicidal ideations to her probation officer and was placed on "5-minute checks." Tr. Ex. Vol. I, State's Ex. 34. On April 15, 2018, JDC staff took J.T. to the emergency room due to a panic attack. While she was there, she told JDC staff she continued to hear voices in her head. She further explained that "she had told her family about that this [sic] and nothing was ever done." *Id.*

[64] On May 1, 2018, J.T. reported suicidal ideations to JDC staff and was again placed on "5-minute checks." *Id.* On May 3, she identified herself as "Star" and "Anna" to the JDC staff, exhibiting anger and giddiness in turn. *Id.* On May 10, JDC staff caught her cutting herself. She stated that she intended to keep harming herself, and JDC staff transported her to the emergency room, where she was treated and returned to the JDC. On May 15, she called a

therapist to report that she had a headache because "the people keep yelling at her and won't stop." *Id.* JDC staff arranged for her to be taken to the emergency room that night, where she "was not responsive" to doctor's questions but commented about the "voices in her head." *Id.* She said, "I didn't want to come[,] she is going to be pissed off." *Id.* On May 18, she called her therapist again to say, "I am scared of switching and then someone getting hurt." *Id.*

[65] Meanwhile, Dr. Antoinette Kavanaugh, a forensic psychologist and Ph.D., interviewed J.T. on April 10 and April 12, 2018. J.T.'s attorney had contacted Dr. Kavanaugh for assistance in determining whether waiving J.T. to adult criminal court would be appropriate. Dr. Kavanaugh also interviewed J.T.'s parents, as well as J.T.'s half-sister and GAL Bellin.

[66] Dr. Kavanaugh had J.T. fill out several diagnostic questionnaires and personality assessments. J.T.'s answers to one diagnostic questionnaire indicated that she had experienced severe physical abuse, emotional neglect, emotional abuse, severe sexual abuse, and physical neglect (meaning that her basic physical needs had not been met in the past). Dr. Kavanaugh compared J.T.'s scores to those of other adolescent females who had been placed in residential treatment programs for felonious acts and determined that her scores revealed abuse and neglect that were worse than most of the people in that population.

Dr. Kavanaugh determined from other diagnostic tools that J.T. had severe problems with disordered thinking, depression, and poor memory. She compared J.T.'s results with a group of adolescent females in residential treatment programs and a group of adolescent females in a correctional setting and determined that J.T.'s needs more closely resembled the group in residential treatment than in a correctional setting.

Next, although J.T. showed signs of posttraumatic stress, anxiety, sleep disorders, and depression, she did not display symptoms of conduct disorders such as oppositional defiant order, which are commonly seen in adolescents in the juvenile justice system. Dr. Kavanaugh opined, "[J.T.'s] not like the, um, sort of your typical kid in corrections. She's more like the kid who has mental health problems and needs help for those." Tr. Vol. II, p. 221. Dr. Kavanaugh determined J.T. was at moderate risk to reoffend due to the severity of the offense, but the risk could be minimized by "appropriate mental health services" and "protective factors" such as family support or its equivalent. Tr. Ex. Vol. I, Defendant's Ex. B, p. 25. She further concluded, "there is probably a relationship between her violence and her disorder, so, therefore, that points to the importance of treating the mental health disorder." Tr. Vol. III, p. 44.

Dr. Kavanaugh also determined, based on reviewing the results of J.T.'s diagnostic tests and reading the reports of mental health professionals who had previously assessed J.T., that she may be "underreport[ing]" her sexual trauma. Tr. Vol. II, p. 229. She also stated, "we don't fully know what's happened to

her as a child," and effective treatment will require a mental health professional to "take some time in developing a therapeutic relationship." *Id.* at 228.

[70] The record of J.T.'s traumatic family life, her history of severe mental illness, and her actions and statements before, at the time of, and after Maria's death informed the juvenile court's decision to retain jurisdiction over J.T. The record establishes that, but for J.T.'s severe mental illness, it is unlikely that she would have ever posed a danger to herself, her family, or to society at large. As a result, determining whether J.T. adequately rebutted the presumption of waiver of juvenile court jurisdiction depends on whether there is evidence to support the juvenile court's determination that her interests and society's interests are best served by the treatment J.T. would receive through the juvenile system as opposed to the adult correctional system.

[71] Dr. Alan Wax, who evaluated J.T. three weeks after she was first detained and diagnosed her with DID combined with schizophrenia, concluded she needed "long-term inpatient treatment" consisting of a combination of talk therapy and medication. Tr. Ex. Vol., Defendant's Ex. D. p. 9. If the treatment is truly long term, treatment outcomes can be "positive." *Id.* The treatment should occur in "a secure, safe facility such as a psychiatric hospital." *Id.* at 11.

[72] Dr. Alan Barzman, a psychiatrist who specializes in child and adolescent psychiatry, assessed J.T. in November 2015 and recommended that she receive "intensive therapy as soon as possible for DID and PTSD from an expert in

DID" at a "residential treatment facility." Tr. Ex. Vol. I, Defendant's Ex. F, p. 5.

[73] Dr. Syed Khan disagreed with the diagnosis of DID, concluding that J.T. was experiencing PTSD, but he further stated in an evidentiary hearing on J.T.'s competency that the best environment for J.T. would be "long-term residential care."[9] Tr. Vol. I, p. 74. Lisa Carrico, who was J.T.'s therapist at the Hospital, also stated that a "residential placement" would provide the "structure and supervision" that J.T. needed. *Id.* at 88.

[74] Dr. Kavanaugh stated that J.T. needs residential treatment that, at a minimum, focuses on treating her underlying trauma. "Ideally, you want them to also specialize in DID treatment, because that's really what she needs." Tr. Vol. II, p. 250. According to Dr. Kavanaugh, the goal should be working "toward getting a fusion of the other personalities and to help [J.T.] understand how they came to be and what about her background she needs to deal with it." *Id.* One study of DID shows that young adults with DID who receive thorough, early treatment may show signs of improvement, including "remission of symptoms." Tr. Ex. Vol. I, State's Ex. 32.

---

[9] As noted above, the juvenile court held a three-day evidentiary hearing on the State's motion to waive jurisdiction. In addition, the court held prior evidentiary hearings on subjects including J.T.'s competency to stand trial. The court stated in its order on waiver that it took judicial notice of the "record." Appellant's App. Vol III, p. 180. We construe the court's statement as meaning that the court considered evidence from evidentiary hearings prior to the waiver hearing in the course of deciding on whether to waive jurisdiction.

[75] Dr. Kavanaugh further stated J.T.'s issues "could be addressed within the jurisdictional time that the juvenile court has her," that is to say, until she turns twenty-one. Tr. Vol. III, p. 6. Residential treatment, as opposed to placement at an Indiana Department of Correction (DOC) facility, would be best because residential treatment can "give her more intensive treatment and when she's younger so that she can benefit from it." *Id.* at 8.

[76] It must also be noted that J.T. displayed less severe symptoms while she was in the residential setting of the Hospital, and the symptoms worsened when she was returned to the correctional setting of the JDC. This evidence supports the juvenile court's determination that J.T. needs treatment in a secure residential facility, preferably by mental health professionals who specialize in DID, under juvenile court supervision.

[77] The State argues that there are sufficient juvenile mental health services available in the adult correctional system to treat J.T.'s conditions, and it is possible that J.T. could be placed in a secure residential facility rather than a correctional setting even if she is waived to criminal court and convicted of murder as an adult. This argument is a request to reweigh the record. There is no guarantee that, if J.T. were waived to adult court, she would be placed in a secure residential facility rather than the DOC. Further, Dr. Kavanaugh explained that she spoke with DOC employees who provided mental health services to juveniles, and she determined: (1) the diagnostic test they use does not screen for symptoms of DID; (2) their treatment is "trauma informed," Tr. Vol. III, p. 4, meaning that they help adolescents understand when their

symptoms are caused by trauma, but they do not treat the underlying trauma; and (3) they do not have anyone on staff that specializes in treating DID, which J.T. needs.[10]

[78] The State further contends that J.T. will receive treatment through the juvenile court only until she turns twenty-one, but that if J.T. were waived to adult court, she could continue to receive treatment past age twenty-one. This contention is also a request to weigh the evidence, because Dr. Kavanaugh testified that there is a good chance that J.T.'s conditions can be sufficiently addressed before she turns twenty-one.

[79] Finally, the State questions the validity of Dr. Kavanaugh's opinions, claiming her analysis is flawed and inaccurate because she: (1) mistakenly believed the Hospital was not providing any services to J.T. other than competency restoration, when in fact the Hospital was also attempting to treat her symptoms; (2) failed to review all of the Hospital's records on J.T.; and (3) was unaware of certain facts, including J.T.'s internet research prior to July 23, 2015, and her prior arrangement to meet with J.P. and run away. The State extensively questioned Dr. Kavanaugh about these issues on cross-examination. As a result, the juvenile court was allowed to consider these alleged shortcomings while weighing Dr. Kavanaugh's testimony.

---

[10] DOC staff told Dr. Kavanaugh that they are able to treat all juveniles regardless of diagnosis, but they did not indicate whether any of their mental health professionals specialize in DID.

Neither the juvenile court nor this Court can predict the future. It is possible that DID-focused treatment in a residential setting, under the juvenile court's supervision, will not adequately address J.T.'s mental illness. It is also possible that after J.T. becomes an adult, the symptoms of her mental illness will resurge, or she will fail to obtain adequate treatment. For today, we can only conclude that the juvenile court's decision is not against the logic and effects of the facts and circumstances, and as a result the court did not abuse its discretion in denying the State's motion to waive jurisdiction.

## Conclusion

For the reasons stated above, we affirm the judgment of the trial court.

Affirmed.

Baker, J., and Pyle, J., concur.